Citation Nr: 1454751 
Decision Date: 12/11/14 Archive Date: 12/17/14

DOCKET NO. 09-48 268 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Chicago, Illinois


THE ISSUES

1. Evaluation of patellofemoral syndrome of the right knee, currently rated as noncompensable.

2. Evaluation of patellofemoral syndrome of the left knee, currently rated as noncompensable.

3. Evaluation of degenerative joint disease of the thoracolumbar spine, currently rated as noncompensable.

4. Evaluation of status post superior labral anteroposterior injury of the right
shoulder with degenerative changes, currently rated as noncompensable.

5. Entitlement to service connection for Ehlers-Danlos syndrome, to include
polyarthropathies of the knees, hips, and ankles.

6. Entitlement to service connection for a cervical spine disorder with bilateral arm numbness.


7. Entitlement to service connection for a heart disorder, to include as secondary to service-connected disability.


REPRESENTATION

Appellant represented by: Veterans of Foreign Wars of the United States


ATTORNEY FOR THE BOARD

G. E. Wilkerson, Counsel


INTRODUCTION

The Veteran served on active duty from August 2001 to July 2008.

These matters initially came before the Board of Veterans Appeals (Board) on appeal from a November 2008 rating decision issued by the Department of Veterans Affairs (VA) Regional Office (RO) in Chicago, Illinois.

In her Substantive Appeal (VA Form 9), the Veteran requested a hearing before a
Veterans Law Judge at the RO. In January 2010, she clarified that she wanted a videoconference hearing with a Veterans Law Judge, or in the alternative, a Travel Board hearing. She was scheduled for a Travel Board hearing in March 2013. She failed to report for the scheduled hearing and has not requested rescheduling of the hearing. As such, her hearing request is deemed withdrawn. See 38 C.F.R. § 20.704(d) (2014).

This case was previously remanded by the Board in October 2013 for additional development, including additional VA examinations. As will be discussed below the Veteran was scheduled for the VA examinations, but failed to report.

In April 2014, the case was again remanded for additional development of the record. The case has since returned to the Board for the purpose of appellate disposition. For the following reasons, the Agency of Original Jurisdiction (AOJ) is found to have complied with the Board's remand instructions. Stegall v. West, 11 Vet. App. 268, 271 (1998).

This appeal was processed using the Virtual VA and VBMS paperless claims processing systems. Accordingly, any future consideration of this appellant's case should take into consideration the existence of this electronic record.

The issue of entitlement to service connection for a heart disorder is addressed in the REMAND portion of the decision below and is REMANDED to the Agency of Original Jurisdiction (AOJ).


FINDINGS OF FACT

1. The Veteran's service-connected patellofemoral pain syndrome of the right knee been manifested by complaints pain on motion of the knee on examination, but it has not been the functional equivalent of flexion limited to 30 degrees of the right knee; knee extension was not impaired and instability of the knee has not been demonstrated.

2. The Veteran's service-connected patellofemoral pain syndrome of the left knee has been manifested by complaints pain on motion of the knee on examination, but it has not been the functional equivalent of flexion limited to 30 degrees of the left knee; knee extension was not impaired and instability of the knee has not been demonstrated.

3. The Veteran's service-connected degenerative joint disease of the thoracolumbar spine has been manifested by complaints of pain on motion of the lumbar spine on examination, but does not cause limitation of flexion to 60 degrees or less, or combined range of motion of the thoracolumbar spine to 120 degrees or less, or muscle spasm, guarding, or localized tenderness severe enough to result in abnormal gait or abnormal spinal contour, does not demonstrate neurologic impairment, and/or does not cause incapacitating episodes as defined by VA.

4. The Veteran's service-connected status post superior labral anteroposterior injury of the right shoulder with degenerative changes has been manifested by complaints of pain on motion of the right arm on examination, but does not cause limitation of motion of the arm to shoulder level.

5. Ehlers-Danlos syndrome was incurred in service. 

6. A cervical spine disorder did not manifest in service and is not attributable to service; arthritis of the cervical spine did not manifest to a compensable degree within one year of discharge from service.


CONCLUSIONS OF LAW

1. The criteria for an initial 10 percent rating for patellofemoral pain syndrome of the right knee have been met. 38 U.S.C.A. § 1155, 5107 (West 2014); 38 C.F.R. §§ 3.655, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5019, 5003-5260 (2014).

2. The criteria for an initial 10 percent rating for patellofemoral pain syndrome of the left knee have been met. 38 U.S.C.A. § 1155, 5107 (West 2014); 38 C.F.R. §§ 3.655, 4.40, 4.45, 4.59, 4.71a, Diagnostic Codes 5019, 5003-5260 (2014).

3. The criteria for an initial 10 percent rating for degenerative joint disease of the thoracolumbar spine have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.655, 4.40, 4.45, 4.59, 4.71a Diagnostic Code 5242 (2014). 

4. The criteria for an initial 10 percent rating for degenerative joint disease of the thoracolumbar spine have been met. 38 U.S.C.A. §§ 1155, 5107 (West 2014); 38 C.F.R. §§ 3.655, 4.40, 4.45, 4.59, 4.71a Diagnostic Code 5201 (2014). 

5. Ehlers-Danlos syndrome was incurred in service. 38 U.S.C.A. § 1110 (West 2002); 38 C.F.R. § 3.303 (2014).

6. A cervical spine disorder with bilateral arm numbness was not incurred in or aggravated by service, and arthritis may not be presumed to have been incurred therein. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 1131, 1137, 5103(a), 5103A, 5107 (West 2014); 38 C.F.R. §§ 3.159, 3.303, 3.304, 3.307, 3.309, 3.655 (2014). 


REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. The Veterans Claims Assistance Act of 2000

The Veterans Claims Assistance Act of 2000 (VCAA), Pub. L. No. 106-475, 114 Stat. 2096 (Nov. 9, 2000) (codified at 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5106, 5107, 5126 (West 2014)) redefined VA's duty to assist the Veteran in the development of a claim. VA regulations for the implementation of VCAA were codified as amended at 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a) (2014).

Given the favorable disposition of the claims for service connection for Ehlers-Danlos syndrome, the Board finds that all notification and development actions needed to fairly adjudicate this aspect of the appeal have been accomplished.

Under VCAA, VA must inform the claimant of any information and evidence not of record (1) that is necessary to substantiate the claim; (2) that VA will seek to provide; (3) that the claimant is expected to provide; and (4) must request that the claimant provide any evidence in his possession that pertains to the claim. Pelegrini v. Principi, 18 Vet. App. 112, 120-21 (2004); 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b).

The United States Court of Appeals for Veterans Claims (Court) has also held that the VCAA notice requirements of 38 U.S.C.A. § 5103(a) and 38 C.F.R. § 3.159(b) apply to all five elements of a service connection claim. Those five elements include: 1) Veteran status; 2) existence of a disability; 3) a connection between the Veteran's service and the disability; 4) degree of disability; and 5) effective date of the disability. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006).

The claims for increased initial ratings arise from the Veteran's disagreement with the rating assigned in connection with the grant of service connection for the disabilities. The courts have held, and VA's General Counsel has agreed, that where an underlying claim for service connection has been granted and there is disagreement as to "downstream" questions, the claim has been substantiated and there is no need to provide additional VCAA notice or prejudice from absent VCAA notice. Hartman v. Nicholson, 483 F.3d 1311, 1314-15 (Fed. Cir. 2007); Dunlap v. Nicholson, 21 Vet. App. 112, 116-17 (2007); VAOPGCPREC 8-2003 (2003). The Court has elaborated that filing a notice of disagreement begins the appellate process, and any remaining concerns regarding evidence necessary to establish a more favorable decision with respect to downstream elements (such as a disability rating) are appropriately addressed under the notice provisions of 38 U.S.C.A. §§ 5104 and 7105 (West 2002). Goodwin v. Peake, 22 Vet. App. 128, 137 (2008).

As regard the remaining claim for service connection hereing decided, in a September 2008 pre-rating letter, the RO notified the Veteran of the evidence needed to substantiate the claim for service connection. This letter also satisfied the second and third elements of the duty to notify by delineating the evidence VA would assist in obtaining and the evidence it was expected that she would provide. Quartuccio v. Principi, 16 Vet. App. 183, 186-87 (2002); Charles v. Principi, 16 Vet. App. 370 (2002).

The Veteran has substantiated her status as a veteran. The Veteran was notified of all other elements of the Dingess notice, including the disability rating and effective date elements of her claims, in the September 2008 letter.

The Board further finds that VA has complied with the duty to assist by aiding the appellant in obtaining evidence. In this case, VA obtained the Veteran's service treatment records and VA treatment records, and in particular treatment records VA outpatient treatment records dated from January 2009, as requested in the Board's 2014 remand.

While the Veteran also was provided an opportunity to provide testimony at a Board hearing, she failed to appear.

The record reflects that, pursuant to the October 2013 Board remand, the AOJ requested that an examinations be scheduled for the Veteran to assess the current nature and etiology of the claimed Ehlers-Danlos syndrome and cervical spine disorder, as well as to assess the severity of the service-connected knee, right shoulder and thoracolumbar spine disabilities. There is a notation in the record that the Veteran failed to report for her examinations scheduled in December 2013. There is no evidence of record indicating that the Veteran requested that the examinations be rescheduled or that she provided good cause for her failure to report. See 38 C.F.R. § 3.655. 

None of VA's letters to the Veteran have been returned as undeliverable, and the current address of record is that which was provided to VA appears to be current and correct.

In order for VA to process claims, individuals applying for VA benefits have a responsibility to cooperate with the agency in the gathering of the evidence necessary to establish allowance of benefits. See Morris v. Derwinski, 1 Vet. App. 260, 264 (1991). Moreover, VA's duty to assist is not always a one-way street, and if a veteran wishes help, he/she cannot passively wait for it in those circumstances where he/she may or should have information that is essential in obtaining the putative evidence. Wood v. Derwinski, 1 Vet. App. 190, 193 (1991); see also Swann v. Brown, 5 Vet. App. 229, 233 (1993).

For these reasons, the AOJ is found to have substantially complied with the Board's remand instructions. See Dyment v. West, 13 Vet. App. 141, 146-147 (1999) (remand not required under Stegall, 11 Vet. App. at 268 where Board's remand instructions were substantially complied with).

Because the Veteran failed to report to her VA examination, and because these are original claims for compensation, these claims are being evaluated on the basis of the evidence of record. See 38 C.F.R. § 3.655(b).

For the reasons set forth above, the Board finds that VA has complied with the VCAA's notification and assistance requirements. The claims on appeal are thus ready to be considered on the merits.

II. Initial Ratings

Disability evaluations are determined by application of the criteria set forth in the VA's Schedule for Rating Disabilities, which is based on average impairment in earning capacity. 38 U.S.C.A. § 1155; 38 C.F.R. Part 4. An evaluation of the level of disability present must also include consideration of the functional impairment of the Veteran's ability to engage in ordinary activities, including employment. 38 C.F.R. § 4.10. When a question arises as to which of two ratings apply under a particular diagnostic code, the higher evaluation is assigned if the disability more closely approximates the criteria for the higher rating. 38 C.F.R. § 4.7. After careful consideration of the evidence, any reasonable doubt remaining is resolved in favor of the Veteran. 38 C.F.R. § 4.3.

The Veteran's entire history is to be considered when making disability evaluations. See generally 38 C.F.R. § 4.1; Schafrath v. Derwinski, 1 Vet. App. 589 (1995).

The Court has held that "staged" ratings are appropriate for any rating claim when the factual findings show distinct time periods where the service-connected disability exhibits symptoms that would warrant different ratings. See Hart v. Mansfield, 21 Vet. App. 505 (2007); Fenderson v. West, 12 Vet. App 119 (1999). In this case, the disabilities have not significantly changed and uniform evaluations are warranted. 

In addition, when assessing the severity of musculoskeletal disabilities that are at least partly rated on the basis of limitation of motion, as all of the Veteran's disabilities are, VA must also consider the extent that the Veteran may have additional functional impairment above and beyond the limitation of motion objectively demonstrated, such as during times when his symptoms are most prevalent ("flare-ups") due to the extent of his pain (and painful motion), weakness, premature or excess fatigability, and incoordination-assuming these factors are not already contemplated by the governing rating criteria. DeLuca v. Brown, 8 Vet. App. 202, 204-7 (1995); see also 38 C.F.R. §§ 4.40, 4.45, 4.59.

In every instance where the schedule does not provide a zero percent rating for a diagnostic code, a zero percent rating shall be assigned when the requirements for a compensable rating are not met. 38 C.F.R. § 4.31.

A. Right and Left Knee

The Veteran's patellofemoral syndrome of each knee is rated as noncompensable under the criteria of 38 C.F.R. § 4.71a, Diagnostic Code 5099-5019.

Diagnostic Code 5019 provides that the disability is to be rated on limitation of motion of the affected part, as degenerative arthritis.

Under 38 C.F.R. § 4.71a, Diagnostic Code 5003, degenerative arthritis is rated on the basis of limitation of motion of the specific joint involved. When limitation of motion is noncompensable, a 10 percent rating is for application for each major joint. In the absence of limitation of motion, a maximum schedular 20 percent rating is assigned for degenerative arthritis of two or more major joints or two or more minor joint groups, with occasional incapacitating episodes.

Flexion of the leg is rated noncompensable when limited to 60 degrees, 10 percent when limited to 45 degrees, 20 percent when limited to 30 degrees, and 30 percent when limited to 15 degrees. Under 38 C.F.R. § 4.71a, Diagnostic Code 5260.

Other diagnostic codes provide rating criteria used to evaluate ankylosis, recurrent subluxation or lateral instability, dislocated cartilage, limitation of extension, impairment of the tibia and fibula, and genu recurvatum.

On VA QTC examination in April 2007, prior to the Veteran's discharge, the Veteran reported that she was suffering from bilateral patellofemoral pain syndrome and chondromalacia. She endorsed stiffness and joint pain located at the bilateral knees diffusely. The pain occurred 3 times per week, lasting for 18 hours at a time. She rated her pain a level of 10 on a scale to 10. The pain could be elicited by physical activity and was relieved by rest, medication, ice, and heat. She stated that her condition did not cause incapacitation, and at the time of pain, she reportedly could functional without medication. Functional impairment included limited standing, walking or running.

Inspection of the knees revealed no sign of edema, effusion, weakness, tenderness, redness, heat, abnormal movement, subluxation, or guarding of movement. There was bilateral crepitus on examination. Range of motion testing revealed flexion to 125 degrees on the right, and to 130 degrees on the left with pain on the endpoint of range of motion. Extension was full (0 degrees) bilaterally. After repetition, the examiner noted that joint function was additionally limited by pain, but not by fatigue, weakness, lack of endurance, or incoordination. There was no additional limitation in range of motion in degree. 

Anterior and posterior cruciate ligament stability and medial and lateral collateral ligament stability tests were within normal limits. X-rays of both knees were also within normal limits. 

The examiner diagnosed bilateral patellofemoral syndrome. He indicated that subjective factors included a history of pain worsened with weight bearing, while objective factors were decreased range of motion with pain on examination.

On VA examination prior to the Veteran's discharge in December 2007, the Veteran reported that her bilateral patellofemoral pain syndrome began in 2002 and was not related to any injury. She endorsed symptoms of pain, popping, and burning. Precipitating factors included prolonged sitting, running, and walking, while alleviating factors were rest, ice and heat. Past treatment included orthopedics, physical therapy, and primary care visits. She rated her flare-up pain level as 5 out of 10, and noted that these flare-ups occurred daily and lasted for hours at a time. No additional limitation during flare-up was indicated.

Objectively, the Veteran's gait was normal with no ambulatory aides utilized. The examiner indicted that all joints had full range of motion, muscle strength was 5 out of 5, and there was no pain, weakness, fatigue, palpable swelling, or joint effusion.

The knees were normal in appearance and there was no tenderness to palpation. Range of motion testing revealed flexion to 140 degrees, extension to 0 degrees and full muscle strength bilaterally. Stability testing, including Lachman's, McMurray's, and varus/valgus tests yielded normal findings with no indication of laxity.

The examiner noted that there was no limitation in range of motion from pain, fatigue, weakness, or lack of endurance with repetitive use. Therefore, he could not assess any loss of function due to pain without resort to speculation.

After physical examination and x-rays, the examiner diagnosed bilateral patellofemoral syndrome.

A January 2008 in-service treatment report notes that right knee flexion was measured at 142 degrees and left knee flexion at 142 degrees. Right knee extension was -8 degrees, while left knee extension was 0 degrees. There was no limitation of motion by pain.

An April 2009 treatment note reflects that the Veteran stated that she thought her left knee was getting worse, but she denied pain at that time.

In sum, the record reflects that the Veteran has almost full flexion of both knees, and the January 2008 report notes some hyperflexion and extension. Nonetheless, the clinical findings-particularly the April 2007 QTC examination report reflecting bilateral knee pain with range of motion-clearly demonstrate that the Veteran had periarticular pathology associated with her right and left knees, including painful range of motion. Hence, the provisions of 38 C.F.R. § 4.59 establish that the Veteran is entitled to a minimum compensable evaluation for the right and left knees. Thus, a 10 percent rating is warranted for limited flexion of the each knee under Diagnostic Code 5260.

This evaluation is consistent with painful motion. 38 C.F.R. § 4.59. It is also consistent with limitation of flexion to 45 degrees. In order to warrant a higher rating, there must be the functional equivalent of limitation of flexion to 30 degrees. See DeLuca, supra; 38 C.F.R. § 4.7. Separate evaluations may be assigned for compensable limitation of extension, subluxation, or instability. 

Here, the Board finds that disability ratings in excess of 10 percent are not warranted. Under the criteria of Diagnostic Code 5260, the Veteran has not demonstrated the functional equivalent of flexion limited to 30 degrees in order to warrant a higher disability rating under these criteria. Service records and examination reports consistently demonstrate that the Veteran was able to flex each knee to well over 100 degrees. 

In addition, as noted above, when assessing the severity of a musculoskeletal disability that is at least partly rated on the basis of limitation of motion, VA is generally required to consider the extent that the Veteran may have additional functional impairment above and beyond the limitation of motion objectively demonstrated, such as during times when his symptoms are most prevalent ("flare-ups") due to the extent of his pain, weakness, premature or excess fatigability, and incoordination. See DeLuca, 8 Vet. App. at 202; see also 38 C.F.R. §§ 4.40, 4.45, 4.59. Here, the examiner specifically found that repetition on the range of motion three times did not increase any of these symptoms. Consequently, a higher rating is not warranted on this basis.

Furthermore, there is no evidence of ankylosis, limitation of extension, impairment of the tibia and fibula, or genu recurvatum. With regard to other impairment of either knee, the Veteran has not indicated that she experiences instability of each knee, and on examination, instability of either knee was not demonstrated. As such, the Board concludes that the preponderance of the evidence is against a finding that either of the Veteran's knee disabilities is manifested by recurrent subluxation or lateral instability, and higher evaluations than those assigned herein are not warranted.

The Veteran has not undergone removal of the semilunar cartilage and therefore Diagnostic Code 5259 is not applicable. Furthermore, a rating under Diagnostic Code 5258 is not warranted. There is no evidence that the cartilage is dislocated. In addition, there is no lay or medical evidence of locking. To the extent that there is pain, such manifestation overlaps 38 C.F.R. § 4.59 and Diagnostic Code 5260. See 38 C.F.R. § 4.14. 

As the Veteran failed to report for the examination scheduled in 2013, no further determination can be made on the manifestations and severity of the service-connected bilateral knee disabilities, and the case must be decided solely on the basis of the evidence of record. See 38 C.F.R. § 3.655(b).

B. Thoracolumbar Spine

The Veteran's degenerative joint disease of the thoracolumbar spine is rated 0 percent (noncompensable) under the criteria of 38 C.F.R. § 4.71a, Diagnostic Code 5242. 

Under the General Rating Formula for Diseases and Injuries of the Spine, a 10 percent rating is warranted for forward flexion of the thoracolumbar spine greater than 60 degrees but not greater than 85 degrees; or, combined range of motion of the thoracolumbar spine greater than 120 degrees but not greater than 235 degrees; or, muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour; or, vertebral body fracture with loss of 50 percent or more of the height.

A 20 percent rating is warranted for forward flexion of the thoracolumbar spine greater than 30 degrees but not greater than 60 degrees; or, the combined range of motion of the thoracolumbar spine not greater than 120 degrees; or, muscle spasm or guarding severe enough to result in an abnormal gait or abnormal spinal contour such as scoliosis, reversed lordosis, or abnormal kyphosis.

A 40 percent rating is assigned, forward flexion of the thoracolumbar spine 30 degrees or less; or, favorable ankylosis of the entire thoracolumbar spine.

A 50 percent rating is assigned for unfavorable ankylosis of the entire thoracolumbar spine; and 100 percent for unfavorable ankylosis of the entire spine.

Note 1 to the rating formula specifies that any associated objective neurologic abnormalities, including, but not limited to, bowel or bladder impairment, should be separately evaluated under an appropriate diagnostic code.

Note 2 states that, for VA compensation purposes, normal forward flexion of the thoracolumbar spine is zero to 90 degrees, extension is zero to 30 degrees, left and right lateral flexion are zero to 30 degrees, and left and right lateral rotation are zero to 30 degrees. The combined range of motion refers to the sum of the range of forward flexion, extension, left and right lateral flexion, and left and right rotation. The normal combined range of motion of the thoracolumbar spine is 240 degrees. The normal ranges of motion for each component of spinal motion provided in this note are the maximum that can be used for calculation of the combined range of motion.

Intervertebral disc syndrome (preoperatively or postoperatively) is to be evaluated either under the General Rating Formula for Diseases and Injuries of the Spine or under the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes, whichever method results in the higher evaluation when all disabilities are combined under § 4.25.

A 10 percent disability rating is assigned for incapacitating episodes having a total duration of at least one week but less than two weeks during the past twelve months, with higher evaluations for incapacitating episodes of increased duration.

Note 1 states that an incapacitating episode is a period of acute signs and symptoms due to intervertebral disc syndrome that requires bed rest prescribed by a physician and treatment by a physician.

Note 2 indicates that if intervertebral disc syndrome is present in more than one spinal segment, provided that the effects in each spinal segment are clearly distinct, the rater is to evaluate each segment on the basis of incapacitating episodes or under the General Rating Formula for Diseases and Injuries of the Spine, whichever method results in a higher evaluation for that segment.

On VA QTC examination prior to the Veteran's discharge in April 2007, the Veteran endorsed stiffness and pain localized at the low back. The pain occurred 2 times per week and each time lasted for 1 day. She rated her pain a level of 5 on a scale to 10. The pain could be elicited by physical activity and posture and standing for long periods. It was relieved by rest, medication, stretching and "cracking" the back. She stated that her spine condition did not cause incapacitation. Functional impairment included limited lifting, bending, or standing during flare-ups.

The examination revealed no evidence of radiating pain on movement. Muscle spasm was absent. No tenderness was noted. A straight leg raise test was negative bilaterally. There was no ankylosis of the lumbar spine. Flexion was to 85 degrees, extension was to 25 degrees, and right and left lateral flexion and rotation were each to 30 degrees. There was pain at the endpoint of range of motion on flexion, extension, and right and left lateral flexion. After repetitive use, pain had the major functional impact, but there was no additional limitation in degrees.

Inspection of the spine revealed normal head position with symmetry in appearance. There was symmetry of spinal motion with normal curvature of the spine. There were no signs of intervertebral disc syndrome with chronic and permanent nerve root impingement. 

Neurological examination of the lower extremities revealed that motor and sensory function were within normal limits. Reflex examination revealed knee jerk and ankle jerk of 2+ bilaterally. 

X-ray of the thoracic spine showed mild degenerative arthritic changes, while a lumbar spine x-ray was within normal limits. 

The examiner diagnosed thoracic degenerative arthritis and lumbar sprain. He noted that subjective factors included persistent back pain, while objective factors included decreased range of motion with pain and x-ray evidence of thoracic degenerative changes.

A July 2007 MRI of the lumbar spine revealed slight degenerative disc disease at L4-5. An x-ray revealed minimal anterior spondylosis of L2.

July 2007 range of motion testing revealed flexion to 110 degrees, reduced to 105 on 3 repetitions, extension to 40 degrees, left lateral flexion to 33 degrees, right lateral flexion to 37 degrees, left lateral rotation to 55 degrees, and right lateral rotation to 50 degrees. Localized tenderness, muscle spasm, abnormal gait, and abnormal spinal contour were absent. No Waddel signs were present.

On VA examination in December 2007, the Veteran reported that her back condition started in 2005 and was not related to any injury. She endorsed symptoms of pain and stiffness. Precipitating factors included prolonged standing and road marches, while alleviating factors included rest and stretching. Past treatment include physical therapy and primary care visits. She rated her pain a level of 8 out 10 on flare-ups. She reported that these flare-ups occurred only when aggravating factors were present. Flare-ups generally lasted a duration of hours at a time, and she had no additional limitation during flare-ups.

Objectively, the Veteran's gait was normal with no ambulatory aides utilized. The examiner indicted that all joints had full range of motion, muscle strength was 5 out of 5, and there was no pain, weakness, fatigue, palpable swelling, or joint effusion.

The lumbar spine was normal in appearance and the area was nontender to palpation. No muscle spasms were noted. Straight leg raising was negative. Flexion was to 90 degrees, extension was to 30 degrees, and right and left lateral flexion and rotation were each to 30 degrees. There was no limitation in range of motion from pain, fatigue, weakness, or lack of endurance with repetitive use. Therefore, the examiner indicated that he would need to resort to speculation in order to assess any functional loss due to pain. Neurologically, no sensory deficits were noted, and gait, stance and coordination were normal. 

The examiner noted that the MRI was abnormal and assigned a diagnosis of slight lumbar degenerative disc disease at L4-5. 

On VA treatment in December 2010, the Veteran reported abdominal pain, nausea, headache, and a backache which she rated a level of 5 out of 10.

When rating disabilities based on limitation of motion, the intent of the Rating Schedule is to "recognize painful motion with joint or periarticular pathology as productive of disability," as well as to recognize that "actually painful" joints, due to healed injury, are entitled to at least the minimum compensable rating for the joint. 38 C.F.R. § 4.59. Similarly, disability of the musculoskeletal system is primarily the inability, due to damage or infection in parts of the system, to perform the normal working movements of the body with normal excursion, strength, speed, coordination and endurance. Functional loss may be due to the absence or deformity of structures or other pathology, or it may be due to pain, supported by adequate pathology and evidenced by the visible behavior in undertaking the motion. 38 C.F.R. § 4.40. These regulations apply regardless of whether the painful motion is related to arthritis. Burton v. Shinseki, 25 Vet. App. 1, 5 (2011).

The April 2007 VA QTC examination finding of pain with range of motion is the symptomatology that 38 C.F.R. §§ 4.40 and 4.59 indicate would warrant a compensable, 10 percent rating. Consequently, the Board finds that a 10 percent rating is warranted for the Veteran's degenerative joint disease of the thoracolumbar spine based on painful motion on examination.

This evaluation is consistent with painful motion. 38 C.F.R. § 4.59. It is also consistent with forward flexion of the thoracolumbar spine less 85 degrees but greater than 60 degrees, or combined range of motion of the thoracolumbar spine less than 235 degrees but greater than 120 degrees, or muscle spasm, guarding, or localized tenderness not resulting in abnormal gait or abnormal spinal contour, or vertebral body fracture with loss of 50 percent or more of the height. 

In order to warrant a higher rating, there must be the functional equivalent of limitation of flexion to 60 degrees or less but not greater than 30 degrees, or combined range of motion of the thoracolumbar spine to 120 degrees or less, or muscle spasm, guarding, or localized tenderness severe enough to result in abnormal gait or abnormal spinal contour. See DeLuca, supra; 38 C.F.R. § 4.7. In this case, however, limitation of flexion to 60 degrees or less, combined range of motion to 120 degrees or less, or an abnormal gait or abnormal spinal contour have not been shown.

In addition, as noted above, when assessing the severity of a musculoskeletal disability that is at least partly rated on the basis of limitation of motion, VA is generally required to consider the extent that the Veteran may have additional functional impairment above and beyond the limitation of motion objectively demonstrated, such as during times when his symptoms are most prevalent ("flare-ups") due to the extent of his pain, weakness, premature or excess fatigability, and incoordination. See DeLuca, 8 Vet. App. at 202; see also 38 C.F.R. §§ 4.40, 4.45, 4.59. Here, the examiner specifically found that repetition on the range of motion three times did not cause any additional limitation in degree. Consequently, a higher rating is not warranted on this basis.

Separate ratings for associated objective neurologic abnormalities or chronic neurologic manifestations are not warranted because neurologic findings and symptoms warranting separate ratings have not been demonstrated. In this case, the Veteran has not complained of pain or other symptoms radiating to the lower extremities, and neurologic examinations have yielded normal neurologic findings. In the absence of any quantifiable neurologic impairment, there is no basis to rate a condition. Accordingly, a separate evaluation for neurologic manifestations is not warranted.

The Board has considered other appropriate diagnostic codes, particularly Diagnostic Code 5243 Intervertebral Disc Syndrome. However, there is no evidence of incapacitating episodes as contemplated by the regulation, and neither the lay or medical evidence suggests that there has been physician prescribed bed rest. In light of the lack of evidence demonstrating any episodes requiring bed rest prescribed by a physician and treatment by a physician for Intervertebral Disc Syndrome, and indeed, in light of the lack any assertion on the part of the Veteran that the criteria for incapacitating episodes have been met, the Board finds that a higher rating under the Formula for Rating Intervertebral Disc Syndrome Based on Incapacitating Episodes is not warranted.

Again, as the Veteran failed to report for the examination scheduled in 2013, no further determination can be made on the manifestations and severity of the service-connected thoracolumbar spine disability, and the case must be decided solely on the basis of the evidence of record. See 38 C.F.R. § 3.655(b).

C. Right Shoulder

The Veteran's status post superior labral anteroposterior injury of the right
shoulder with degenerative changes is rated as noncompensable under the criteria of 38 C.F.R. § 4.71a, Diagnostic Code 5299-5201.

Under Diagnostic Code 5201, a 20 percent rating is warranted when the major or minor arm is limited to shoulder level. A maximum 40 percent disability evaluation is warranted when the major arm is limited to 25 degrees from the side.

Handedness for the purpose of a dominant rating will be determined by the evidence of record, or by testing on VA examination. Only one hand shall be considered dominant. As demonstrated by the evidence of record, the Veteran is right-handed and as such, minor, as opposed to major, shoulder disability ratings are applicable. 38 C.F.R. § 4.69.

The regulations define normal range of motion for the shoulder as forward flexion from zero to 180 degrees, abduction from zero to 180 degrees, external rotation to 90 degrees, and internal rotation to 90 degrees. See 38 C.F.R. § 4.71a, Plate I.

On VA QTC examination in April 2007, the Veteran reported that she had been suffering from dislocated right shoulder. The condition was due to injury that occurred after being pushed and falling out of a moving car about 6 years ago. The Veteran endorsed symptoms of locking (during certain movements), dislocation (initial injury) and pain. The pain occurred 2 times per week and each time lasted for 4 hours. She rated her pain level as 10 out of 10. It could be elicited by physical activity and was relieved by rest. She reported intermittent right shoulder pain with
overhead activities or pushups. She stated that her condition did not cause incapacitation. She was not receiving any treatment for her condition. Functional impairment included occasional difficulty with overhead activities and push-ups.

Objectively, there was no sign of edema, effusion, weakness, tenderness, redness, heat, abnormal movement, subluxation, or guarding of movement. Range of motion testing revealed flexion to 147 degrees, abduction to 150 degrees, external rotation to 90 degrees, and internal rotation to 60 degrees with pain at the end of range of motion.

The examiner noted that joint functional was additional limited by pain on repetitive use, but not by fatigue, weakness, lack of endurance, or incoordination. Junction function was not additionally limited in degrees.

X-ray of the right shoulder was within normal limits. The examiner diagnosed rights shoulder strain. Subjective factors included a history of painful right shoulder, while objective factors were right shoulder decreased range of motion and pain on examination.

A June 2007 MRI of the right shoulder revealed suspect anterosuperior labral injury (SLAP), possible mild bursitis localized in subacromial-subdeltoid bursae, and degenerative change within the supraspinatus and infraspinatus tendon without tear.

A July 2007 service treatment report reflects that the Veteran presented with a chief complaint of right shoulder pain and 3 subluxations in the past year. She rated her current pain as 0, but indicated that the pain increased to a level of 3-5 out of 10 with movement. She indicated that she had more soreness than pain. Aggravating factors included sleeping on her right side and generalized movements. 

Objectively, there was no swelling or effusion. O'Brien's, apprehension, and empty can tests were positive. There was grinding in the shoulder during rotation. Posterior impingement, sulcus, and load and shift tests were negative. Range of motion was within normal limits, and abduction was to 170 and forward flexion to 180 degrees. Upper extremity strength was 4 out of 5 for all shoulder motions. Sensation was intact. An assessment of right upper extremity degenerative joint disease and instability with labral tear was noted. 

On VA examination in December 2007, the Veteran reported that she initially injured her right shoulder in 2001. Subjective symptoms included pain and subluxations from joint injury. Precipitating factors were exercise, lifting, and bending, while symptoms were relieved with medication and rest. Past treatment included orthopedics and physical therapy. During flare-ups, her pain level was 4 out of 10, and these occurred daily lasting for hours at a time. No additional limitation during flare-ups was indicated.

The examiner indicted that all joints had full range of motion, muscle strength was 5 out of 5, and there was no pain, weakness, fatigue, palpable swelling, or joint effusion. There was no limitation in range of motion from pain, fatigue, weakness, or lack of endurance with repetitive use. Therefore, the examiner indicated that he would need to resort to speculation in order to assess any functional loss due to pain.

The shoulders were normal in appearance and there was no tenderness to palpation. Right shoulder flexion was to 180 degrees, abduction was to 18 degrees, internal rotation was to 90 degrees, and external rotation was to 90 degrees. 

The examiner noted that a right shoulder MRI was abnormal and assigned a diagnosis of right shoulder SLAP injury with degenerative changes to within the supraspinatus and infraspinatus tendon.

The Veteran also underwent right shoulder range of motion testing in service in January 2008. It was noted that both shoulders showed hypermobility and went past normal end range of motion. 

Also in January 2008, the Veteran reported increased right shoulder pain and noted that it occasionally woke her up at night. She rated her pain a level of 7 out of 10 at worse.

Objectively, there was no swelling or effusion. A sulcus test was positive, while load and shift tests were negative. Scapulohumeral rhythm was fair. She had increased difficulty lowering her right upper extremity after elevating it above shoulder level and had to shift the position of the humerus in relation to the glenoid in order to lower it back to neutral. Range of motion was within normal limits. An assessment of right upper extremity degenerative joint disease and instability with labral tear was noted.

The May 2008 Physical Evaluation Board report noted right shoulder flexion to 180 degrees and abduction to 180 degrees. It was noted that the condition was rated as periarticular pathology related to Ehlers-Danlos (a congenital condition) but permanently aggravated by 7 years of a service as a combat medic. Right shoulder subluxation was also indicated.

A June 2009 neurology note reflects that the Veteran had a history of shoulder dislocations. It was also noted that the Veteran underwent EMG studies of the upper extremities, which yielded normal results. The possibility of intermittent compression of the brachial plexus was suggested. Physical therapy shoulder girdle strengthening and improved posture was ordered. 

A July 2009 VA physical medicine rehab treatment plan note reflects that range of motion for both shoulders was within functional limits. 

Again, the examination finding of pain with range of motion is the symptomatology that 38 C.F.R. §§ 4.40 and 4.59 indicate would warrant a compensable, 10 percent rating. Consequently, the Board finds that a 10 percent rating is warranted for the Veteran's status post superior labral anteroposterior injury of the right
shoulder with degenerative changes based on painful motion on examination.

However, a rating in excess of 10 percent evidence is not warranted. Here, the evidence does not establish range of arm motion limited to shoulder level. The Board has considered claimed functional impairment due to pain on motion and other factors but does not find adequate pathology to support a higher rating. See DeLuca. 

As the Veteran does not have ankylosis of the scapulohumeral articulation, or impairment of the humerus or clavicle or scapula and Diagnostic Codes 5200, 5202 and 5203 are not for consideration. 

Again, no further determination can be made on the manifestations and severity of the service-connected right shoulder disability due to the Veteran's failure to report for recent VA examination, and the case must be decided solely on the basis of the evidence of record. See 38 C.F.R. § 3.655(b).

D. All Claims

As to consideration of referral for an extraschedular rating, such consideration requires a three-step inquiry. See Thun v. Peake, 22 Vet. App. 111 (2008), aff'd sub nom. Thun v. Shinseki, 572 F.3d 1366 (Fed. Cir. 2009). The first question is whether the schedular rating adequately contemplates the Veteran's disability picture. Thun, 22 Vet. App. at 115. If the criteria reasonably describe the claimant's disability level and symptomatology, then the claimant's disability picture is contemplated by the rating schedule, the assigned schedular evaluation is, therefore, adequate, and no referral is required. If the schedular evaluation does not contemplate the claimant's level of disability and symptomatology and is found inadequate, then the second inquiry is whether the claimant's exceptional disability picture exhibits other related factors such as those provided by the regulation as governing norms. If the Veteran's disability picture meets the second inquiry, then the third step is to refer the case to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether an extraschedular rating is warranted. 

The discussion above reflects that the symptomatology associated with the Veteran's disabilities is fully contemplated by the applicable rating criteria. The symptomatology reported by the Veteran and shown on examination is contemplated by the rating criteria used to assign disability evaluations, and there is no characteristic or manifestations shown that is outside the purview of the applicable rating criteria or is so exceptional as to render the criteria in applicable. While there is some indication of hypermobility of the joints, the examination reports describe her main functional limitation as pain, which is considered in the relevant diagnostic criteria. All potentially relevant rating codes have been considered and evaluated. Consideration of whether the Veteran's disability picture exhibits other related factors such as those provided by the regulations as "governing norms" is therefore not required. In any event, the Veteran did not claim, and the evidence does not reflect, that there has been marked interference with employment, frequent hospitalization, or that the Veteran's symptoms have otherwise rendered impractical the application of the regular schedular standards. The evidence of record certainly shows that the Veteran's disabilities would impact her ability to work. However, the level of interference shown is contemplated by the numerous disability evaluations already assigned to the Veteran's disorders. Therefore, referral for consideration of an extraschedular rating for any of the disabilities on appeal is not warranted. 38 C.F.R. § 3.321(b)(1). 

Additionally, the Veteran has not alleged or indicated that the collective impact or combined effect of more than one service-connected disability presents an exceptional or unusual disability picture to render inadequate the schedular rating criteria. See Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014). Nonetheless, the Board has fully considered the Veteran's additional service-connected disabilities in concluding that referral for consideration of an extraschedular rating is not warranted

For the foregoing reasons, the Board concludes that there is no basis for staged ratings of the Veteran's right and left knee pateollofemoral syndrome, degenerative joint disease of the thoracolumbar spine, and status post superior labral anteroposterior injury of the right shoulder with degenerative changes, as her symptoms have been primarily the same throughout the appeal period. In this regard, the Board finds that a higher, initial 10 percent rating for each of these disabilities is warranted. In reaching this decision, the Board has favorably applied the benefit-of-the-doubt doctrine. See 38 U.S.C.A. § 5107(b); 38 C.F.R. §§ 3.102, 4.3; Gilbert v. Derwinski, 1 Vet. App. 49, 55-56 (1990).




III. Service Connection Claims

Service connection will be granted if the evidence demonstrates that a current disability resulted from an injury or disease incurred in or aggravated by active military service. 38 U.S.C.A. §§ 1110, 1131; 38 C.F.R. § 3.303(a) . Establishing service connection generally requires competent evidence of three things: (1) a current disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship, i.e., a nexus, between the claimed in-service disease or injury and the current disability. Holton v. Shinseki, 557 F.3d 1362, 1366 (Fed. Cir. 2009); 38 C.F.R. § 3.303(a).

Under 38 C.F.R. § 3.303(b), an alternative method of establishing the second and third elements is through a demonstration of continuity of symptomatology. However, 38 C.F.R. § 3.303(b), applies to only those chronic diseases listed in 38 C.F.R. § 3.309(a). See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013). 38 U.S.C.A. § 1101. With respect to the current appeal, this list includes arthritis. See 38 C.F.R. § 3.309(a). 

Service connection may also be granted for a disease first diagnosed after discharge when all of the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

In addition, for Veterans who have served 90 days or more of active service during a war period or after December 31, 1946, certain chronic disabilities, including arthritis, are presumed to have been incurred in service if they manifested to a compensable degree within one year of separation from service. 38 U.S.C.A. §§ 1101, 1112, 1113; 38 C.F.R. §§ 3.307(a), 3.309(a). However, in order for the presumption to apply, the evidence must indicate that the disability became manifest to a compensable (10 percent) degree within one year of separation from service. See 38 C.F.R. § 3.307.

The Board notes that the Veteran did not engage in combat with the enemy. Therefore, the combat provisions of 38 U.S.C.A. § 1154 (West 2002) are not applicable.

The Veteran's service treatment records include a January 2001 entrance examination noting that the spine, upper and lower extremities and musculoskeletal system were normal, outside of a notation of mild asymptomatic pes planus. Ehlers-Danlos syndrome was not noted on entry. The Veteran also denied a pertinent history on report of medical history at entrance.

A July 2007 report from Vanderbilt Medical Genetics reflects that the Veteran presented with concerns regarding joint pain and joint laxity. She stated that she was in good health until 2002, when she started having increased joint pain after physical activity associated with joining the Army. Since that time, she had 3 shoulder dislocations as well as hip dislocations. After review of the Veteran's medical history and testing results, the examiner confirmed a diagnosis of Ehlers-Danlos syndrome. 

A July 2007 treatment report notes complaint of neck and back pain.

On Report of Medical History dated in October 2007, the Veteran endorsed pain in her neck and hands.

A December 2007 VA examination report includes a notation that the Veteran's Ehlers-Danlos Syndrome "started at birth," with symptoms beginning at age 18.

The Veteran underwent examination related to her Physical Evaluation Board in December 2007. It was noted that the Veteran's condition was stable but continued service would worsen the present predisposed genetic problem. It was noted that the condition existed prior to service and was permanently aggravated by service.

A May 2008 Physical Evaluation Board report reflects that the Veteran had Ehlers-Danlos syndrome with joint pains that interfered with her ability to perform her duties. It was noted that this condition was a congenital condition. 

Following service, and October 2008 VA examination report notes that the Veteran had an extensive orthopedic history, including joint laxity and polyarthropathy and was ultimately diagnosed with Ehlers-Danlos Syndrome in July 2007, which is a congenital disorder. 

After physical examination, the examiner noted Ehlers-Danlos syndrome and noted that it was congenital disorder which is causal of polyarthropathy joint laxity with chronic pain and likely causal of her mild cardiac valve defects, gastroesophageal reflux disease, and recurrent urinary tract infection. He determined that this congenital preexisting condition was not permanently worsened by service beyond its natural progression. 

A February 2009 cervical spine MRI revealed degenerative disc disease with disc bulges. There was no significant central stenosis. Osteopenic changes in the vertebrae were also noted.

The Veteran complained of neck pain in June 2009 and was assessed with bilateral arm and hand pain, numbness and tingling with radicular component and cervical radiculopathy.

On VA treatment in July 2009, the Veteran endorsed neck pain. She complained of intermittent pain in the posterior neck radiating to both arm and hand. She was assessed with soft tissue dysfunction and decrease in functional mobility due to ongoing neck pain.

In September 2010, it was noted that the Veteran's radicular pain had vastly improved in a patient with what seemed to be muscular neck pain with tenderness and soreness to palpation.

As regards the claimed Ehlers-Danlos syndrome, the record reflects that this condition is congenital. VA's General Counsel has indicated that there is a distinction between a congenital or developmental "disease" and a congenital "defect" for service connection purposes. Congenital diseases may be recognized as service connected if the evidence as a whole shows aggravation in service within the meaning of VA regulations. 38 C.F.R. § 3.306. 

VA's General Counsel explained that the definition that indicated that diseases were capable of improving or deteriorating whereas defects were stationary in nature was essentially valid and helped to clarify the differences between the terms. Id. Determining if a Veteran's disability is congenital defect or disease is a medical question. Id.

In this case, the Veteran failed to report to a December 2013 VA examination intended to address this medical question. However, in this case, the Board notes that the Veteran's service treatment records and the findings of the Physical Evaluation Board demonstrate that the Veteran's congenital Ehlers-Danlos syndrome progressed in service. A service department finding that injury, disease or death occurred in the line of duty will be binding on VA, unless it is patently inconsistent with the facts and the requirements of laws administered by VA. 38 C.F.R. § 3.1(m). Given this service department finding of progression of Ehlers- Danlos syndrome, the Board finds that this disability is a disease and not a defect, as it is not stationary in nature. See O'Bryan v. McDonald, ___ F.3d ___,No. 2014-7027, 2014 WL 6480539 (Vet. App. Feb. 12, 2013) (noting that a congenital or developmental condition that is progressive in nature-that can worsen over time-is a disease rather than a defect). 

Next, the Board much address whether such condition preexisted service. Additional laws and regulations apply, when there is evidence that a disability preexisted service. Every Veteran is presumed to have been in sound condition at entry into service, except as to defects, infirmities, or disorders noted at the time of such entry, or where clear and unmistakable evidence demonstrates that the injury or disease existed before entry and was not aggravated by such service. Only such conditions as are recorded in examination reports are to be considered as noted. 38 U.S.C.A. § 1111; 38 C.F.R. § 3.304(b). 

Determination of the existence of a preexisting condition may be supported by contemporaneous evidence, or recorded history in the record, which provides a sufficient factual predicate to support a medical opinion, see Miller v. West, 11 Vet. App. 345, 348 (1998), or a later medical opinion based upon statements made by the Veteran about the pre-service history of the condition. Harris v. West, 203 F.3d 1347 (Fed. Cir. 2000). The burden is on VA to rebut the presumption of soundness by clear and unmistakable evidence that the Veteran's disability was both preexisting and not aggravated by service. Wagner v. Principi, 370 F.3d 1089, 1094-96 (Fed. Cir. 2004).

In this case, Ehlers-Danlos syndrome was not noted on entry. Therefore, the presumption of soundness is applicable.

Moreover, despite the service notation that such condition pre-existed service, there is no indication that the Veteran experienced any manifestations of the disease prior to service, and service treatment records document that was without pertinent complaint until service. A diagnosis of Ehlers-Danlos syndrome is not noted until 2007, approximately 6 years after her entrance into service. As such, the Board finds that the evidence does not clearly and unmistakably establish that the Veteran's Ehlers-Danlos syndrome first manifest prior to service, and therefore the Veteran is presumed sound at entry.

In addition, service treatment records reflect initial onset and aggravation of this disability in service. While the 2008 VA examiner determined that there was no aggravation of the disorder, no rationale for this opinion was noted. Moreover, this opinion is based on the premise that the Veteran's Ehlers-Danlos syndrome preexisted service, which the Board has concluded that the evidence not clearly and unmistakably establish. Therefore, this opinion is afforded little probative value. 

For these reasons, the Board finds that the weight of the evidence supports the conclusion that the Veteran's Ehlers-Danlos syndrome was incurred in service, and that service connection must be granted.

As regards the claimed cervical spine disability, service treatment records reflect complaint of neck pain, and post service treatment records also report cervical spine complaints and diagnosis of degenerative disc disease. However, there is insufficient evidence of a nexus linking the current disability to the service complaints.

Again, without an examination to resolve the question of medical nexus raised by the record, no further determination can be made regarding the diagnosis and relationship to service of the Veteran's claimed cervical spine disability with bilateral arm numbness and the case must be decided solely on the basis of the evidence of record. See 38 C.F.R. § 3.655(b).

The Board has considered the Veteran's statements to the effect that her cervical spine problems have been ongoing since service and that her current cervical spine and arm numbness is related to service. The Board recognizes that the Veteran, as a layperson, is competent to report on matters observed or within her personal knowledge. See Layno v. Brown, 6 Vet. App. 465, 469 (1994). However, as a layperson not shown to possess appropriate medical training and expertise, the Veteran is not competent to render a competent opinion on etiology of her current cervical spine as such matter requires medical expertise to determine. See Jandreau v. Nicholson, 492 F.3d 1372, 1376-77 (Fed. Cir. 2007) (noting general competence to testify as to symptoms but not to provide medical diagnosis). "The beliefs of lay witnesses (including claimants) on issues of diagnosis and medical causation are not competent evidence in situations where those issues require medical expertise to resolve." Kahana v. Shinseki, 24 Vet. App. 428, 438 (2011) (Lance, J., concurring). 

Thus, the Veteran's opinion that her current cervical spine disability with related bilateral hand numbness is related to her in-service symptoms is not a competent medical opinion. There is also no medical evidence of nexus, and the possibility of obtaining such on remand was precluded by the Veteran's failure to for the scheduled examination.

Finally, there is no diagnosis of arthritis of the cervical spine within one year of discharge from service. As such, service connection on a presumptive basis is not warranted.

For the foregoing reasons,while the Board concluded that service connection for Ehlers-Danlos syndrome is warranted, the preponderance of the evidence is against the claim for service connection for a cervical spine disorder with bilateral arm numbness. The benefit-of-the-doubt doctrine is therefore not for application, and the claim must be denied. See 38 U.S.C.A. § 5107(b); 38 C.F.R. § 3.102; Gilbert, 1 Vet. App. at 55-56.

ORDER

An initial 10 percent rating for patellofemoral syndrome of the right knee is granted, subject to the controlling regulations applicable to the payment of monetary benefits.

An initial 10 percent rating for patellofemoral syndrome of the left knee is granted, subject to the controlling regulations applicable to the payment of monetary benefits.

An initial 10 percent rating for degenerative joint disease of the thoracolumbar spine is granted, subject to the controlling regulations applicable to the payment of monetary benefits.

An initial 10 percent rating for status post superior labral anteroposterior injury of the right shoulder with degenerative change is granted, subject to the controlling regulations applicable to the payment of monetary benefits.

Service connection for Ehlers-Danlos syndrome is granted.

Service connection for cervical spine disorder with bilateral arm numbness is denied.


REMAND

The Veteran contends that she is also entitled to service connection for a heart disorder, to include as secondary to Ehlers-Danlos syndrome.

In this case, service treatment records include a March 2007 VA QTC examination report indicating that the Veteran complained of heart palpitations and tachycardia. A chest x-ray was within normal limits. After physical examination and EKG, the examiner indicated that no diagnosis with respect to the claimed heart condition was warranted, as there was no pathology to render a diagnosis.

An August 2007 echocardiogram report notes that the left atrium was within normal limits, LV chamber size and contractility was intact, the right heart was intact, and there was trace mitral regurgitation and trace tricuspid regurgitation.

On report of medical history dated in October 2007, the Veteran endorsed heart palpitations.

The May 2008 Physical Evaluation Board report notes that the Veteran had mitral/tricuspid regurgitation related to Ehlers-Danlos Syndrome.

On VA examination in October 2008, the VA examiner indicated that the Veteran's mild cardiac valve defects were due to her Ehlers-Danlos syndrome. However, he also indicated that the Veteran did not have organic heart disease and her murmur was asymptomatic..

Given the Board's decision herein granting service connection for Ehlers-Danlos syndrome, and the evidence of record suggestive of a relationship between the Veteran's claimed heart disorder and Ehlers-Danlos syndrome, the matter of entitlement to service connection for a heart disorder must be remanded to the RO for readjudication of the matter, to include consideration of whether service connection on a secondary basis is warrant.

Accordingly, the case is REMANDED for the following action:

After completing any development deemed warranted, the AOJ should readjudicate the Veteran's claim for service connection for heart disorder, to include as secondary to service-connected disability, in light of the Board's decision granting service connection for Ehlers-Danlos syndrome. If the benefits sought on appeal are not granted, the Veteran and her representative should be provided a Supplemental Statement of the Case.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

 This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).


____________________________________________
H. N. SCHWARTZ
Veterans Law Judge, Board of Veterans' Appeals


Department of Veterans Affairs